**FERNANDO SIERRA BERDECÍA, ETC., demandante y recurrente,**
*v.* **PEDRO A. PIZÁ, INC., demandada y recurrida.**

*Número*: 358    *Resuelto*: 6 de noviembre de 1962

448

*Manuel Janer Mendía* y *Carlos Bastián Ramos,* abogados del recurrente; *Leopoldo C. Delucca,* abogado de la recurrida.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente Accidental de Sala y los Jueces Asociados Señores Blanco Lugo y Dávila.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

Amparándose en la legislación de salario mínimo vigente en Puerto Rico desde 1941, (¹) el Secretario del Trabajo

---

(¹) Las dos leyes básicas sobre la materia son la Núm. 8 de 5 de abril de 1941, 29 L.P.R.A. secs. 211 a 240, y la Núm. 96 de 26 de junio de 1956, 29 L.P.R.A. (Supl.) secs. 245 a 246m.

instó una querella en reclamación de salarios adeudados por concepto de vacaciones contra la corporación Pedro A. Pizá, Inc. Originalmente la acción se estableció para beneficio de siete vendedores a comisión de automóviles, pero posteriormente se incluyeron cuatro beneficiarios adicionales. El período a que se refiere la reclamación cubre desde el año 1951 hasta el 1959. No hay controversia alguna sobre el importe adeudado en caso de que interpretemos que los decretos de salario mínimo que se invocan cubren la labor por ellos realizada. La única cuestión en discusión(²) es si, a base de la prueba desfilada, las personas para cuyo beneficio se presentó la querella, eran empleados de la querellada o si, por el contrario, eran contratistas independientes, como sostuvo el tribunal de instancia.

Precisa, pues, hacer un breve recuento de los decretos mandatorios que pueden resultar aplicables. En 5 de abril de 1945 se promulgó el Decreto Mandatorio Núm. 8 fijando salarios mínimos, horas máximas de labor y condiciones de trabajo en el negocio de ventas al por menor, que se definió como "todo acto, proceso, operación, trabajo o servicios necesarios, incidentales o relacionados con las ventas al por menor, a traspasos directos a los consumidores *de cualquier clase de mercaderías o artículos* a cambio de dinero, prestación o cosa de valor, cuando tales ventas o traspasos se originen, concierten o consumen en algún establecimiento o en sitio cualquiera destinado total o parcialmente a esos fines, o *cuando se hagan fuera de dicho establecimiento* o sitio a su nombre o para su beneficio. . ." Se reconoció el derecho a vacaciones a razón de quince días al año a todo empleado permanente, las cuales serían acumulables durante dos años, debiéndose satisfacer las así acumuladas al cesar el empleado en su trabajo (Artículo F-3). La primera revisión del decreto mencionado fue efectiva en 15 de agosto de 1955.

---

(²) En *Sierra Berdecía* v. *Hull Dobbs Co.*, 86 D.P.R. 445, hemos sostenido que el decreto fijando salarios y condiciones de trabajo para el comercio al por menor es aplicable al negocio de venta de automóviles al por menor.

Contiene una definición más concisa de la industria, pero sustancialmente igual a la original, y provee expresamente que las disposiciones relativas a salario mínimo, garantía de compensación semanal mínima y períodos máximos de labor no serán aplicables a los empleados que trabajan bonafide como "viajantes vendedores" (Artículo 3, 29 R.&R.P.R. sec. 245n-133.([3]) En cuanto se refiere a vacaciones se establece el derecho a las mismas a razón de $1\frac{1}{4}$ día laborable por cada mes en que el empleado haya tenido por lo menos 120 horas de labor, y se autoriza su acumulación siempre que no exceda de dos años, pero si excediere de dicho término, el patrono deberá pagarle además dos veces el sueldo correspondiente por el período en exceso de dichos dos años (Artículo 8, 29 R.&R.P.R. sec. 245n-138). Comienza a regir en 10 de mayo de 1958 el Decreto Mandatorio Núm. 42, que sustituye el Decreto Núm. 8 en cuanto se refiere a salario mínimo únicamente, y que para tales fines reitera que la definición de la industria "no incluye tampoco a los empleados que trabajan como viajantes-vendedores" (Artículo 2, 29 R.&R.P.R. sec. 245n-642). Sin embargo, todo lo relativo a las vacaciones contenido en el Decreto Núm. 8 original y revisado permanece en vigor en virtud de la cláusula de salvedad expresa de la sección 40(b) de la Ley de Salario Mínimo de 1956, *supra*, 29 L.P.R.A. (Supl. 1961) sec. 246k.([4])

Las personas para cuyo beneficio se inició la demanda prestaban servicios a la empresa querellada en la venta de

---

([3])Idéntica exclusión aparece en el artículo 1 del Decreto Mandatorio Núm. 16 (29 R.&R.P.R. sec. 245n-271), y el artículo 2 del Decreto Núm. 34 (29 R.&R.P.R. sec. 245n-562) aplicables a la industria del comercio al por mayor y almacenaje, véase, *A. D. Miranda, Inc.* v. *Falcón,* Srio. de Justicia, Int., 83 D.P.R. 735, y en el artículo 3 del Decreto Núm. 24 (29 R.&R.P.R. sec. 245n-443) de la industria de cerveza.

([4])Dicha sección lee como sigue:

" .     .     .     .     .     .     .     .

"(b) Las disposiciones contenidas en los derechos mandatorios vigentes a la aprobación de esta ley *que no sean las relativas a salario mínimo,* subsistirán en toda su fuerza y vigor a pesar de que la Junta posteriormente, por decreto u orden al efecto, varíe los tipos de salario mínimo."

automóviles y recibían como compensación una suma equiva-
lente al cinco por ciento de la diferencia entre el precio de la
unidad y el valor tasado del vehículo del cliente que se tomaba
como parte del precio (*trade in*). Excepcionalmente, y
debido a las circunstancias peculiares de la transacción—
ventas a agencias e instrumentalidades gubernamentales y
ventas a empresas de taxímetros—se les abonaba una canti-
dad fija. Igualmente, en ocasiones, los vendedores consentían
a rebajar el importe de su comisión para asegurar la consu-
mación de una transacción. Esta comisión se les liquidaba y
pagaba semanalmente mediante cheque expedido al efecto, y
sin que los vendedores firmaran nóminas. Bajo las normas
establecidas, y aunque no se marcaban las horas de entrada
y salida, los vendedores concurrían durante los días labora-
bles, entre ocho y ocho y media de la mañana, a las oficinas
de la empresa donde se les proporcionaba una relación de
clientes potenciales que debían visitar en el curso del día.
En caso de que no pudieran asistir era su obligación llamar
por teléfono al gerente de ventas de la corporación demandada,
o a la secretaria de éste, para explicar el motivo de su
ausencia. A menos que estuvieran ocupados en una gestión
importante tenían que ir a las oficinas a las dos de la tarde
"para comprobar que uno estaba en sus gestiones de venta".
Diariamente se rendía un informe de las gestiones reali-
zadas durante el día anterior, y la información trasmitida
era acopiada por la empresa para futura referencia. Ori-
ginalmente estos informes se preparaban por escrito, "lo
hacíamos en un librito", pero esta práctica se descontinuó.
La labor de los vendedores consistía en visitar a los clien-
tes potenciales en el área metropolitana, ya que en el resto
de la Isla la corporación tenía corresponsales o distribuidores,
e interesarlos en la adquisición de unidades cuya distribución
local realizaba la propia agencia Pedro A. Pizá, Inc. desta-
cando para ello las ventajas, bondades y conveniencias de
los automóviles de la empresa. Sin embargo, la palabra final

en cuanto a términos y condiciones de una transacción correspondía al gerente de ventas, y para ello, los vendedores traían a los talleres de Pizá las unidades usadas para ser tasadas a los fines de abonar su importe al precio del automóvil. Una vez cumplido con este paso preliminar, el gerente instruía a los vendedores sobre las condiciones para realizar la venta y les encomendaba que visitaran nuevamente al interesado para tratar de concertar definitivamente el negocio. Los vendedores sólo podían ofrecer los vehículos que distribuía Pizá, y si se les sorprendía haciendo gestiones para vender de otras marcas, se les despedía inmediatamente.

Además del trabajo usual y corriente que se ha descrito, los vendedores estaban obligados a concurrir a reuniones con funcionarios de la empresa, que se celebraban frecuentemente, y en las cuales se les instruía sobre técnicas de venta y ventajas del producto que era preciso señalar al consumidor, y se discutía la labor efectuada con miras a intensificar la actividad de ventas. Los vendedores estaban supuestos a realizar un número mínimo de negocios para mantener sus relaciones con la empresa, ya que si no se cubría la cuota asignada, se les reemplazaba o se les suspendía el suministro de ciertas facilidades que se les proporcionaban para la promoción de ventas. A preguntas de que "si a usted se le presentaba un día bueno y vendían [sic] dos o tres unidades... y ganaba suficiente para la semana, ¿podía quedarse en su casa, o estaba obligado a venir a trabajar?", se respondió: "Estaba obligado" (T.E., pág. 65). Igualmente a los vendedores se les requería para que asistieran durante las tardes de algunos sábados al salón de exhibición de los carros nuevos para fines de demostración a los interesados, y por esta actividad no se les pagaba compensación alguna.

La empresa facilitaba un automóvil para demostración a cada vendedor y además sufragaba parte de los gastos de gasolina. Igualmente pagaba las primas de una póliza de

responsabilidad pública que cubría dichos vehículos mientras eran utilizados para las gestiones del trabajo. También estaban cubiertos por otro seguro para el caso de que los automóviles se utilizaran para propósitos personales, pero no se estableció en forma satisfactoria la identidad de la persona que satisfacía el costo de este seguro adicional. La transcripción está huérfana de prueba sobre extremos tales como el pago de las cuotas por concepto de indemnizaciones a obreros, seguro social y seguro de desempleo.(5) No tenían escritorio asignado en las oficinas de la corporación ni se les autorizaba a incurrir en gastos de representación para fomentar las ventas. Hasta aquí los elementos fácticos que deben considerarse para resolver el planteamiento apuntado.

El tribunal recurrido sostuvo que, a base de los hechos expuestos, la relación existente entre las partes no era la de patrono y empleado a que se refieren los decretos y que los vendedores a comisión eran contratistas independientes. Para ello consideró el grado de control que ejercía la empresa sobre la conducta de éstos, y especialmente, que "la querellada no dirigía, controlaba, o intervenía en el método utilizado por los querellantes para realizar sus funciones o labores," así como el hecho de que la querellada "no tenía control sobre el horario de los querellantes." Al así hacerlo, cometió error.

Independientemente de que, como veremos más adelante, las conclusiones a derivarse de los hechos expuestos deben ser contrarias a las que se formularon por el tribunal a quo, precisa fijar previamente ciertas normas para la determinación de la naturaleza de la relación entre patrono y empleado, en contraposición a un contratista independiente. Ante todo, conviene anticipar que el concepto tradicional del derecho común sobre los rasgos característicos de un contratista independiente no tienen lugar de aplicación estricta en

---

(5) Véanse, Anotaciones, *Salesman on commission as within unemployment compensation or social security acts*, 29 A.L.R.2d 751 (1953), y 138 A.L.R. 1413 (1942).

la interpretación de estatutos reguladores de salarios mínimos y condiciones de trabajo. De ahí que los casos citados en la opinión recurrida no sean aplicables por fundarse esencialmente en la distinción trazada en el derecho común entre un contratista independiente y un empleado. (⁶) Además, en ninguno de ellos se interpretaba un estatuto de carácter reparador como lo es la Ley de Salario Mínimo y, en consecuencia, los decretos promulgados bajo sus disposiciones. (⁷) Sabido es que en consideración a la política pública que inspira esta legislación social —el mejoramiento de las condiciones de trabajo para lograr normas mínimas de bienestar general de los trabajadores— en caso de duda de si un decreto es aplicable a determinada clase de empleados, no debe prevalecer una interpretación restrictiva que los excluya de la protección que brinda, *Sierra, Comisionado* v. *Llamas*, 73 D.P.R. 908 (1952). ██

(⁶)*Plomb Tool Co.* v. *Sanger*, 193 F.2d 260 (CA 9, 1951); *Ryan-Richards, Inc.* v. *Whitesides*, 96 F.2d 826 (CCA 10, 1938); *Arkansas Power & Light Co.* v. *Richenback*, 119 S.W.2d 515 (Ark. 1938); *C. M. Farmer Stave & Heading Co.* v. *Whorton*, 102 S.W.2d 79 (Ark. 1937); *Humphries, et al.* v. *Kendall*, 111 S.W.2d 492 (Ark. 1937); *Mississippi River Fuel Corporation* v. *Young*, 67 S.W.2d 581 (Ark. 1934); *Moaten* v. *Columbia Cotton Oil Co.*, 97 S.W.2d 629 (Ark. 1936); *Powell* v. *Virginia Construction Co.*, 13 S.W. 691 (Tenn. 1890); *Jones* v. *Standerfer*, 15 N.E.2d 924 (Ill., 1938); *Prest-O-Lite Co.* v. *Skell*, 106 N.E. 365 (Ind. 1914); *Lee Moor Contracting Co.* v. *Blanton*, 65 P.2d 35 (Ariz. 1937); *Thompson* v. *Robinson-Roberts Co.*, 56 P.2d 599 (Cal. 1936); *Hollingsworth* v. *Robe Lumber Co.*, 45 P.2d 614 (Wash. 1935); *Evans* v. *State Industrial Commission*, 18 P.2d 885 (Okla. 1933); *Flickenger* v. *Industrial Accident Commission*, 184 P. 851 (Cal. 1919); *Henry Haertel Service, Inc.* v. *Industrial Commission*, 248 N.W. 430 (Wis. 1933); *Los Angeles Athletic Club* v. *United States*, 54 F. Supp. 702 (Cal. 1944). *Modern Motors* v. *Elkins*, 113 P.2d 969 (Okl. 1941), único caso citado en que se trataba de un vendedor de automóviles a comisión, es distinguible en cuanto a los hechos y dista muy lejos de favorecer la posición de la querellada.

(⁷)Hemos tenido ocasión de discutir la diferencia entre contratista independiente y empleado a los fines de fijar responsabilidad en daños y perjuicios—*Mariani* v. *Christy*, 73 D.P.R. 782, 796-799 (1952); y en materia de compensación por accidentes del trabajo —*Atiles, Admor.* v. *Comisión Industrial*, 68 D.P.R. 115 (1948); *Atiles, Admor.* v. *Comisión Industrial*, 63 D.P.R. 597 (1944); *Montaner* v. *Comisión Industrial*, 59 D.P.R. 285 (1941); *Romero* v. *Comisión Industrial*, 57 D.P.R. 354 (1940).

Los factores principales que los tribunales han considerado importantes para determinar si se trata de un empleado o de un contratista independiente son, sin pretender enumerarlos todos, los siguientes: 1—naturaleza, extensión y grado de control por parte del principal; 2—el grado de iniciativa o juicio que despliega el vendedor en sus gestiones; 3—la inversión que hace el vendedor en equipo y facilidades para poder realizar la labor, y si para ello es necesario establecer una organización de negocios independiente; y 4—posibilidad de ganancias o pérdidas en las operaciones de venta. *WHM 91:465-466.* De los hechos reseñados anteriormente aparece que la empresa conserva un extenso grado de control sobre las actividades de los vendedores; que éstos no tienen discreción para concertar los negocios sino que se requiere la previa aprobación del gerente de ventas y bajo las condiciones por él prescritas; que los vendedores no hacen inversión alguna en equipo y facilidades, ya que éstas las proporciona la querellada; que no tienen organización alguna independiente para la realización de sus gestiones, pues, entre otras cosas, su base o centro de operaciones es la oficina metropolitana de la querellada, a donde acuden a recibir la relación de negocios que gestionarán durante el día y a rendir informes de su labor; y, finalmente, que no incurren en riesgo alguno de pérdidas, pues su compensación se mide por su propia actividad y el éxito de sus gestiones. No es exacto afirmar que la querellada no interviniese en el método utilizado por los vendedores para realizar sus gestiones. A este respecto la prueba señala que se les adiestra en reuniones especialmente convocadas para ese fin en las técnicas de venta, que se supervisa la actividad individual y se está atento al resultado de la labor por ellos efectuada. Tampoco es correcto aseverar que la empresa no tiene control sobre el horario de los vendedores. Según la evidencia incontrovertida, se les requiere para que concurran a determinadas horas a la oficina del gerente de ventas y rindan informe de la labor que

les ha sido encomendada, lo que proporciona a la querellada la información necesaria y adecuada para determinar si ellos han estado trabajando durante el día. Debemos recordar a este respecto que, debido precisamente a la naturaleza de la labor desempeñada, las disposiciones del decreto sobre jornada de trabajo y salario mínimo no son aplicables a los viajantes-vendedores.

Considerados todos los hechos en conjunto es inescapable la conclusión de que los vendedores a comisión de la querellada eran empleados de ésta, y como tales, tenían derecho a disfrutar del período de vacaciones que establecen los decretos mencionados.

*Se revocará la sentencia dictada por el Tribunal Superior, Sala de San Juan, en 13 de junio de 1960, y se declarará con lugar la demanda condenando a la querellada a satisfacer a los empleados para cuyo beneficio se invocó la reclamación las cantidades a que se hace referencia en la estipulación de las partes de fecha 17 de febrero de 1960, más una suma igual por concepto de penalidad.*

El Juez Presidente Señor Negrón Fernández no intervino.